## STENOGRAPHIC MACHINES, Inc., Petitioner,

v.

## FEDERAL TRADE COMMISSION, Respondent.

### No. 11458.

United States Court of Appeals Seventh Circuit.

May 29, 1956.

L. M. McBride, Robert B. Gerrie, Chicago, Ill., James T. Welch, Washington, D. C., McBride & Baker, Chicago, Ill., of counsel, for petitioner.

Robert B. Dawkins, Asst. General Counsel, J. B. Truly, Attorney, Earl W. Kintner, General Counsel, E. K. Elkins, Attorney, Washington, D. C., for Federal Trade Commission.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

DUFFY, Chief Judge.

Petitioner asks us to vacate and set aside a Cease and Desist Order of the Federal Trade Commission dated March 18, 1955. The complaint charges Petitioner with engaging in unfair methods of competition in violation of § 5 of the Federal Trade Commission Act, 15 U.S. C.A. § 45. In a Per Curiam opinion the Commission affirmed and adopted the findings, conclusions and order of the Trial Examiner.

The complaint charged Stenographic Machines, Inc., the Petitioner herein, LaSalle Extension University, and the latter's wholly-owned subsidary, the Stenotype Company, had entered an agreement to divide the customers in the mechanical shorthand machine market among themselves, so that Petitioner would confine its solicitation and sales of such machines principally to schools, and LaSalle Extension University and its subsidiary (hereinafter referred to collectively as "LaSalle") would confine their solicitation and sales principally to home study or correspondence students. The complaint alleged that the agree-

ment and the practices pursued thereunder have a dangerous tendency to hinder competition and to create a monopoly in the named companies in the sale and distribution of mechanical shorthand machines.

LaSalle Extension University was incorporated in 1908 and is engaged largely in the business of operating a correspondence school. In 1927 LaSalle acquired the assets of the bankrupt Stenotype Company, including the "Stenotype" mechanical shorthand machine which it has marketed under that name since 1927. The present Stenotype Company is a wholly-owned subsidiary of LaSalle. It became inactive in 1948 and since that time its functions have been carried on by LaSalle.

From 1928 to 1936 LaSalle sold the Stenotype machine largely to students taking courses in Stenotypy by the correspondence or home study method, and to a lesser extent to business schools. Starting in 1936 LaSalle began to sell its machine to students enrolled in schools known as "Stenotype Institutions," which LaSalle assisted in organizing. The only course offered in those schools was a course in Stenotypy as distinguished from the average business school teaching a variety of commercial subjects. LaSalle designated the owner or manager of such a school as its "Registrar." The student signed a dual form of contract with LaSalle and with the school. The contract with LaSalle provided for the purchase by the student of the Stenotype machine, texts, lessons and other material from LaSalle, and the contract with the school provided for the furnishing of instruction to the student. Separate payments were made by the student to LaSalle and to the school. This arrangement was known as the "Co-operative Plan."

In the latter part of 1948 LaSalle abandoned the "Co-operative Plan" of operation and began selling its machines, texts and lesson material to the school as a unit. The schools made their own arrangements with the students for the purchase of the machines and materials and payment of tuition. Under the Co-operative Plan LaSalle paid a commission to its salesmen on each sale of a machine and the accompanying material, as well as on the amount of the tuition although LaSalle received no direct benefit from the tuition which was paid to the school. LaSalle's new plan was called the "Package Plan." The school did its own selling to the students and LaSalle was not obligated to pay commissions on such sales. Under the Co-operative Plan, the net to LaSalle, after paying commissions, was $70. Under the Package Plan, LaSalle received about $90 and paid no commission. As LaSalle paid Petitioner $56 for the machine, the increase in revenue to LaSalle was substantial.

Petitioner was incorporated in 1938 and since that time has been engaged in the production and sale of a mechanical shorthand machine known as the "Stenograph" and supplementary text material. Milton H. Wright, the President of Petitioner, was principally responsible for its organization. He obtained the necessary capital from private commercial schools which were, in many cases, customers of Petitioner. Prior to 1936, Wright had been an officer of LaSalle in charge of the sale of Stenotype machines and courses. However, Petitioner and LaSalle were in no way connected by interlocking officers, directors or stock-ownership. Until 1952 Petitioner's machines were manufactured by others in accordance with Petitioner's specifications. In that year Petitioner acquired its own manufacturing plant, and since then has manufactured its own machines.

The LaSalle machines have always been manufactured by others. By 1945 the tools and dies had become worn and in some respects obsolete, so LaSalle entered into a contract with Victor Adding Machine Company to develop a new model Stenotype machine. However, this contract was cancelled in 1947 when it became obvious the cost of producing the new machine would be excessive. LaSalle then approached other manufac-

turing sources in an endeavor to have them produce the machine, but such efforts were unsuccessful. In October, 1948, LaSalle was desperately in need of machines and finally approached Petitioner in an effort to supply it temporarily with Stenograph machines and eventually with a new model Stenotype machine. Negotiations between the two companies resulted in the written contract dated November 16, 1948. This is the contract which the Commission claims is illegal.

Under the provisions of the contract Petitioner agreed to aid LaSalle in developing a new model Stenotype, to have those machines manufactured by Petitioner's manufacturing source under supervision of Petitioner's personnel, and to supply LaSalle with not less than 25,-000 Stenotype machines at the rate of 5,000 per year on a cost plus $10 basis. It was agreed that until the new model could be developed, Petitioner would sell to LaSalle its Stenograph machines. All the tools, dies, gauges, etc., developed for the new model Stenotype became the property of LaSalle. Although the keyboards of the Stenograph and Stenotype machines are identical, there are numerous mechanical differences which require special skills in connection with their service.

LaSalle paid Petitioner the regular school price for machines. Petitioner shipped the machines to LaSalle in bulk, f.o.b. plant. Because LaSalle had overestimated the number of machines needed, a reduction in deliveries was negotiated from time to time, and the contract was finally terminated by a letter agreement dated January 8, 1953. This agreement provided that Petitioner was to continue making Stenotype machines for LaSalle according to the latter's needs, the price to be determined at the time of each order.

The Examiner found that under the agreement "LaSalle was to de-emphasize its school business and place its primary emphasis on home study, and that Stenographic was to be given an opportunity to take over a number of LaSalle's schools as well as to acquire new ones." The Examiner concluded " * * * such agreement has, in substantial measure, been carried into effect."

The Commission bases its case to a large extent upon Paragraph 7 of the November 16, 1948 agreement. This paragraph reads: "7. It is understood and agreed that LaSalle desires to promote the sale of Stenotypes by it to purchasers of its correspondence courses, and through certain private Stenotype Institutes now in existence where sales are made by salesmen under contract with the Stenotype Company or LaSalle. With respect to any school whose contract is terminated, Stenographic, upon notice in writing from LaSalle of such termination, shall thereafter offer Stenographs to such school at Stenographic's regular list price, terms and conditions."

In considering whether LaSalle and Petitioner changed their plans of doing business because of the November 16, 1948 contract, the record clearly shows that from the beginning LaSalle has emphasized the sale of correspondence courses in machine shorthand rather than the sale of the machines themselves. LaSalle has considered the profit in machine shorthand to be in the sale of the correspondence courses rather than in the sale of the machines. Over the years its text material has been designed for home study with LaSalle or the school acting as an advisor and a judge of the progress of the student. On the other hand, Petitioner has no nation-wide sales organization. In fact, it had a sales force of three. Its efforts have consistently been directed at schools which teach mechanical shorthand to students in attendance at those schools. It never attempted to enter the correspondence course field.

The Commission says the November 16, 1948 contract was an agreement to divide customers and thus create a monopoly. But the record clearly indicates the execution of the contract prevented a monopoly in the supplying of mechan-

ical shorthand machines. In 1948 La-Salle was greatly in need of many machines. Its jigs and tools were worn and obsolete; it had exhausted the possibilities of getting others to manufacture the machines. In desperation LaSalle turned to Petitioner. Had the contract not been executed it is a fair inference La-Salle would have had to abandon the manufacture of Stenotype machines and Petitioner's Stenograph machine would have been alone in the field. Instead of creating a monopoly in that respect the contract prevented a monopoly.

Apparently the Commission approved the Examiner's conclusion that for La-Salle to agree that Stenographic was to become its source of supply of Stenotype machines was a "suspicious circumstance." There seems to us to be no substantial basis for such conclusion. The agreement provided LaSalle with a new source of supply of Stenotype machines; it obtained new dies and tools to replace obsolete ones; it obtained an enforceable contract right to receive 25,000 machines over a five-year period.

The Commission apparently detects something sinister in LaSalle's changing from the Co-operative Plan to the Package Plan. In May, 1948, six months prior to the execution of the contract, La-Salle called in all its Institute Registrars and announced the change from the Co-operative Plan to the Package Plan. As previously pointed out, this change was in the exercise of good business management. LaSalle's net profit was thereby increased $20 per sale. The net effect of the change was to remove the burden of the salesmen's commissions from LaSalle and to place that burden upon the schools. There is no substantial evidence in the record which connects up this change in policy with the November, 1948 contract.

LaSalle realized that its change to the Package Plan might prove unacceptable to certain schools which had a considerable investment in the promotion of mechanical shorthand instruction. It was a genuine advantage to LaSalle to be able to require Petitioner to supply mechanical shorthand machines to such schools. It would obviate the possibility of an action for breach of contract.

M. H. Wright, testifying as to his understanding of Paragraph 7 of the contract, said: "I think the essence of the agreement is that if this package that LaSalle was offering was not acceptable to a school, and LaSalle so told us, we would be willing to take that school over, so they wouldn't be deprived of the service they had advertised." Kendall, Manager of LaSalle, testified to the same effect.

In addition to relying on Paragraph 7 of the agreement, the Commission relied on several letters which passed between Petitioner and LaSalle, and on certain correspondence between LaSalle and its customers or potential customers. The letter principally relied on was dated December 9, 1948 and was written by T. K. Elliott to Herman Miller. In 1948 Elliott had the title of Vice President and Sales Manager of Stenotype. By the date of the contract Elliott, because of the condition of his health and business mistakes, had been relieved of many of his responsibilities. He had no part in the negotiation of the November 16 contract. He denied under oath that prior to the hearings he had ever heard of Paragraph 7 of the contract. As Elliott testified "* * * I was the sales manager on the way out. I wasn't included in the negotiations and I thought at the time I should have been." Miller was the owner of a school in Los Angeles, California, known as "The Stenotype Company of California," and a school in San Francisco known as "Stenotype Certified School." He had a ten-year contract due to expire in May, 1949, whereby he represented LaSalle on the West Coast.

In the letter Elliott informed Miller that LaSalle had arranged with Petitioner to manufacture a new Stenotype machine. He then stated: "Naturally, this deal entails some agreements between us. One of those agreements was that we

would not try to steal customers from each other. We agreed with Wright that we would not try to open any new schools which are not at present franchised if he has another school in the immediate territory. * * * "

If this letter had been authorized by LaSalle or written by an officer in authority, there might be an inference that Petitioner and LaSalle were intending to avoid raiding tactics upon each other. But it does not imply an agreement to transfer customers from one to the other. It does not show an agreement to confine sales activities to certain types of customers. Under the circumstances we do not consider the letter to be substantial evidence in support of the Commission's charge of an illegal agreement.

The Commission refers to isolated sentences in other letters and documents. We shall not narrate them in detail. We have given them careful consideration. We quoted from the Elliott-Miller letter because it was, by far, the strongest bit of evidence which the Commission produced. We conclude that the contract of November 16, 1948, together with the letters and documents referred to by the Commission, do not provide substantial evidence to support the Examiner's findings which were approved by the Commission.

Comment should be made upon one further point urged by the Commission. The Commission found that as of 1951 Petitioner was doing business with fifteen schools bearing the name of "Stenotype" or "Stenotype Institute," but this fact cannot be considered evidence to demonstrate the carrying out of an alleged illegal agreement. The record shows Petitioner commenced selling to seventeen Institutes prior to the filing of the complaint, and it had sold to fifteen prior to the date of the alleged illegal agreement. Only two of the seventeen were "acquired" by Petitioner in the more than four years after the date of the contract and one of these was "reacquired" by LaSalle in 1951.

We are convinced from a study of the entire record that following the date of the alleged agreement Petitioner made about the same inroads into LaSalle's business as it had made prior to the date of the agreement. On the record as a whole we conclude that there is no substantial evidence to support the Commission's charges, and that its order dated March 18, 1955 should be vacated and set aside.